[Opinion delivered May 24, 1880.]

---

JAMES COX ET AL. v. E. J. HARVEY.

(Case No. 4097.)

1. CHARGE OF THE COURT.— It is error to charge the jury even hypothetically upon a state of case the evidence did not present, and which might induce them to conclude they were at liberty to find according to the assumed hypothesis. Where the court, in its instruc-

tions to the jury, submits issues upon which there has been no evidence, and it is not clear that the jury have not been misled, the judgment must be reversed.    Austin *v.* Talk, 20 Tex., 167; Yarborough *v.* Tate, 14 Tex., 483; Earle *v.* Thomas, id., 583.

2. Homestead — Abandonment — Charge of the court.— In a suit involving the homestead and the question of its abandonment. an instruction to the jury that, "if it was the fixed intention of Ritz to abandon his homestead at the date of the levy of the attachment, it would not be necessary to prove that such was the intention of his wife also, to entitle the plaintiff to recover," was erroneous.    Gouhenant *v.* Cockrell, 20 Tex., 97; Woolfolk *v.* Ricketts, 48 Tex., 37; Cross *v.* Everts, 28 Tex., 533.

3. Charge of the court — Abandonment of homestead.— On the question of abandonment of the homestead, refusal of the court to instruct the jury, when asked, that "though Ritz and wife left the premises with the intention of abandonment, if they could sell, that that would not necessarily constitute an abandonment which would forfeit their right of exemption.    It must be undeniably clear, and beyond all reasonable ground of dispute, that there has been a total abandonment with intention not to return and claim the exemption, in order to render the property liable for his debts," was error.    Shepherd *v.* Cassiday, 20 Tex., 29.

4. Homestead — Fact case.— See this case for evidence held insufficient to prove abandonment of the homestead.

Appeal from Grayson.    Tried below before the Hon. Joseph Bledsoe.

This suit was instituted by Harvey to recover of Cox and Martin Ritz and wife lots 3 and 4, in block 9, in the town of Whitesboro'.    The petition sets out how the plaintiff acquired title.    McLain & Bro. sued out an attachment against Wm. Ritz in 1875, which was levied on the lots as Ritz's property, and on 13th March, 1875, a judgment and foreclosure was recovered by McLain & Bro. against Ritz for $81.65 and costs.    That in August, 1875, the lots were sold under the judgment and order of sale, and purchased by plaintiff for $112.65.

Cox answered, disclaiming title.

Ritz and wife answered the general denial and set up that the property was their homestead.

The case was submitted to a jury, who returned a verdict for the plaintiff, and there was judgment accordingly.    The

defendants moved for a new trial, which being overruled the defendants appealed.

The defendants assign for error the third and fourth charges given by the judge, the refusal of the charge asked by the defendants, and the overruling the motion for a new trial, for that the verdict was contrary to the law and evidence.

The testimony for the plaintiff was in substance as follows: It was admitted that McLain & Bro. attached the lots as the property of Ritz and recovered judgment and a decree of foreclosure of the attachment lien in March, 1875, as alleged in the petition; that a sale was had under that judgment and order of sale in August, 1875, at which plaintiff became the purchaser, and that these proceedings were regular; that the title to the property was in Ritz at the time of the levy of the attachment; that Ritz had appeared in the suit and moved to quash the attachment on the ground that the lots were his homestead, but his motion was overruled; that he gave notice at the sale that the property was his homestead. That Ritz was a married man and resided on the property until the spring of 1874, and that it was till then his homestead, when he moved with his family across the river into the Indian territory, and has resided there hitherto; that he has acquired no other homestead; that the property has been controlled by him and rented out, except part of the time, for the last year or two, it has been occupied by Ritz and wife.

Charles McLain, plaintiff in the judgment in the justice's court, a witness for the plaintiff, testified: Ritz moved from Whitesboro' to the Indian territory in the early part of 1874. In the spring of 1874 he went to see Ritz and collect his debt from him. He staid all night at his house. Ritz told him he had left Texas for good, never expected to return; abused almost everybody in and around Whitesboro'; "all the time expressing himself in the most positive terms that he had left Texas for all time to come, and expressed a desire to sell his property in Whitesboro'. This witness never heard Ritz's wife say anything about it. All that she

said "went to confirm him in the belief that she was of the same mind with her husband."

Gordon, for plaintiff, testified: That in the summer of 1875 he heard Martin Ritz say he expected to live and die in the territory. He had all his personal property with him, leased some land, built some cabins and set up a blacksmith's shop. He often mentioned his having left Texas.

Overton Love, for the plaintiff, testified: Ritz moved to my place from Whitesboro' in 1873. He is on a place he calls his home. I have frequently heard him say he would not live in Texas another day, and if he could not sell his property he would burn it up; that he had moved the yard gate from his place at Whitesboro'; that his father-in-law had offered him a home in Texas and he would not have it; had never heard him claim his property at Whitesboro' as his homestead until he was sued.

Wilson, for the plaintiff, testified that Mrs. Ritz made a few visits back to Whitesboro', staying a short time, but not till after the suit was commenced.

Defendants then introduced the following testimony: Martin Ritz swore: "We first occupied the property in 1866, and from that time to 1874, when I left and went on a farm. I was broke and desired to recruit, in order that I might run a shop in Whitesboro'. I have not acquired any other homestead. I expected to return to the property in twelve months when I left it. I instructed my attorney, when I left, to pay the taxes and keep the place in repair until my return. Lorena Ritz and I have been married twenty-four years. I never expressed any intention not to return to my home in Whitesboro' as my homestead. I have lived on the property of Judge Love and Jack Florence under a permit; have built some log cabins and fenced one hundred acres.

Lorena Ritz testified to the same facts.

Dr. Kelly testified: "When Martin Ritz was talking of going to the Indian Nation, I urged him not to go — he was indebted to me. He remarked that he was going to the Nation to try to make a raise, and when he got money

sufficient he expected to come back and make his home in Texas or Whitesboro'; am not sure which, but my impression was he did not expect to make his home in the Nation longer than he could succeed in getting money enough to pay off his debts.

This is all the material testimony in the case.

*Fears & Wilkerson*, for appellants.

*Brock & Goodrich* and *J. R. Cowles*, for appellee.

QUINAN, J.— The charges of the judge to which the defendants except are these:

I. "If you believe from the evidence that the defendants had another homestead elsewhere, at the date of the levy of the attachment mentioned, they could not claim the old one."

While it may be admitted that abstractly this is a correct proposition of law, yet we are of opinion that in reference to the testimony in the case it was calculated to mislead the jury. There was no testimony whatever that Ritz had acquired another homestead; it was admitted that he had not, and the only effect that this instruction could have had was to direct the attention of the jury to the facts of the residence of Ritz on Love's land under a permit, his putting up a blacksmith shop, and building some cabins there and fencing some land, and to permit them from these circumstances to infer the acquisition of a new homestead.

"Where the court in its instructions to the jury submits issues upon which there has been no evidence, and it is not clear that the jury have not been misled, the judgment must be reversed." Austin *v.* Talk, 20 Tex., 167. So, it is error to charge the jury even hypothetically upon a state of case the evidence did not present, and which might induce them to conclude they were at liberty to find according to the assumed hypothesis. Yarborough *v.* Tate, 14 Tex., 483; Earle *v.* Thomas, 14 Tex., 583.

The second assignment of errors is that the court erred in holding that an intention to abandon the homestead by the

wife was not necessary in order to subject the same to the husband's debts. The language of the judge's charge is, " if it was the fixed intention of Ritz to abandon his homestead at the date of the levy of the attachment, it would not be necessary to prove that such was the intention of his wife also, to entitle the plaintiff to recover."

We have no adjudications in this state directly upon the point presented in this assignment. It is true, it is said, in Holliman v. Smith, by McAdoo, J.: " The husband is the head of the family; he, not the wife, chooses and establishes the homestead, and when he establishes it, his homestead becomes her homestead whether she be willing or unwilling; . . . when he sees fit to change the homestead and dedicates another, *eo instanti* the new homestead becomes that of the wife and the family also." Holliman v. Smith, 39 Tex., 362.

But this rule would have no application in the present case, for there is no new homestead acquired or dedicated. And what is said of the husband's right in that case to change the homestead, whether the wife were willing or unwilling, was a mere *dictum* not necessary to the disposition of the case.

To the same effect also is the case of Allison v. Shilling, 27 Tex., 454. That when the wife has left the former homestead and *accepted a new one*, she cannot insist upon homestead rights in the abandoned homestead.

But we concur in what is said by Chief Justice Hemphill in Gouhenant v. Cockrell, 20 Tex., 97:

" The husband cannot alienate the homestead without the consent of the wife. Can he deprive her of its benefits by abandoning his residence and wandering from post to pillar, or by the acquisition of casual residences for temporary purposes? This would make the guaranties of the constitution mere form, not substance."

And while we might concede that the homestead might be abandoned and the rights which the wife has in it might be lost even without the acquisition of a new homestead (Woolfolk v. Rickets, 41 Tex., 359), by a clear and

unequivocal, voluntary act on her part, evidenced by her conduct and declarations and assent to removal from it, freely and willingly, and especially so where third persons are induced thereby to give credit or incur liability on the faith of her acts and declarations, that her claim to the homestead no longer exists, we cannot yield our assent to the proposition that without her consent, signified in some mode, to the abandonment of the homestead, the husband has the power to deprive her of its benefits, and subject it to his debts and uses, by simply causing her to remove from it. The constitution prescribes how the homestead shall be alienated. This would be to put in its place a new mode of conveyance and authorize alienation by abandonment. If it cannot be conveyed by deed without her privy examination in solemn form, we confess our inability to understand why in effect it can be alienated by abandonment without her consent. See Woolfolk v. Ricketts, 48 Tex., 37; Dunn v. Tozer, 10 Cal., 171; Cross v. Everts, 28 Tex., 533.

Without undertaking, however, to express any rule absolute upon this subject, we think the charge objectionable (and in this respect it is not supplied by other charges) in not sufficiently instructing the jury upon what would constitute an abandonment of the homestead under the circumstances of this case. Unquestionably, as said by Mr. Justice Moore in Woolfolk v. Rickets (and, indeed, as is said in all the cases in our reports in which the question is discussed), the contemporaneous acts and declarations of the wife to explain the object and purpose of removal from the homestead would be entitled to great weight. We have not the least hesitation in saying, whatever may be the effect of the absence of proof, yet that if proof were made indicating that the removal from the homestead was procured by undue influence, or misrepresentation and false promises of return, or assurances that no permanent abandonment was designed, and that with this understanding her removal was effected, that she would not lose her rights in the homestead thereby, nor would that be a sufficient abandonment in contemplation of law, whatever may have been the intention of her hus-

band, and especially when, as in this case, no injury to third persons resulted therefrom.

The question of abandonment is always a question of intention chiefly. Mrs. Ritz's testimony went directly to the conclusion that the removal from Whitesboro' was not intended as a permanent abandonment; that the family left with the intention of returning; and the effect of the judge's charge must have been to induce the jury to put out of consideration her statements, and to disregard her acts and intentions in connection with the abandonment of her homestead, as throwing no light upon the subject, and to give undue prominence to the acts and statements of Ritz, and to look to them only in the decision of the question.

The third assignment of error is the refusal of the judge to give the instruction asked by the defendant's counsel, to the effect that "though Ritz and wife left the premises with the intention of abandonment if they could sell, that that would not necessarily constitute an abandonment which would forfeit their right of exemption. It must be undeniably clear and beyond all reasonable ground of dispute that there has been a total abandonment, with intention not to return and claim the exemption, in order to render the property liable for his debts."

We think the refusal to give this charge was error. There was some proof about Ritz wishing to sell the property, and without this, the concluding portion of the charge asked, at least, should have been given. It is in the terms repeatedly used by our supreme court in reference to the subject, and was eminently proper to be given in a controversy where the rights of homestead, to which our laws have so tender a regard, were involved. If we are constrained to hold that the old homestead may be lost, without the acquisition of another, by mere abandonment, it ought to be impressed upon the jury that the proof of abandonment must be, to use the language of Chief Justice Hemphill, " undeniably clear and beyond almost the shadow, at least all reasonable ground, of dispute, that there has been a total abandonment with an intention not to return and claim the exemption." Gou-

benant v. Cockrell, 20 Tex., 96; Shepherd v. Cassiday, 20 Tex., 29.

The remaining assignments relate to the refusal of the court to grant a new trial and the insufficiency of the evidence.

Without undertaking to discuss at length the testimony, it is sufficient to say that in our judgment it was insufficient to warrant the finding of the jury. It is unquestioned that the lots sued for were the homestead of Ritz and wife in the spring of 1874, when Ritz went across the river into the Indian Territory. The levy upon them under McLain's attachment was made in less than a year thereafter. The only testimony tending to show an abandonment of the homestead, beyond the fact of the mere removal, consists of McLain's, Gordon's and Love's.

McLain testifies to a conversation with Ritz but upon one occasion, when he called to see about his debt, and he stayed all night with Ritz in the Nation. What Ritz said then was evidently said in a bad humor, and was a mere loose declaration, perhaps thoughtlessly made, and eagerly caught up by a creditor anxious to make his money and willing to find foundation for an attachment.

Ritz's remarks to Gordon were made after the levy of the attachment, and his testimony as to his affairs relates also to a period subsequent to the attachment.

Love testified to petulant remarks of Ritz that he never intended to return to Texas, but we have no means of knowing, when, or under what circumstances, they were made; whether before or after the levy.

And on the other side, we have the positive testimony of Ritz, of his wife and of Dr. Kelly, to the object and purpose at the time of the removal of Ritz from Whitesboro', showing very conclusively, at least to our minds, that there was no intention of a permanent abandonment. And there is no testimony which in the least degree tends to establish that Mrs. Ritz had such intention. McMillan v. Warner, 38 Tex., 410.

We think the court erred in refusing a new trial.

We conclude that there is error in the judgment for which it should be reversed and remanded, and we so award.

REVERSED AND REMANDED.